**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JULIO A. GARCIA and | ) | No. 22 B 130 |
| BONNIE L. GARCIA, | ) | |
| | ) | |
| Debtors. ) | | Judge Goldgar |

**MEMORANDUM OPINION**

Julio and Bonnie Garcia have been trying to sell their business property on Chicago's north side since at least early 2019.  The Garcias have been in a hurry to sell it because Albany Bank and Trust is foreclosing on the mortgage – a mortgage securing a $1.1 million loan that the Garcias stopped paying four years ago – and is on the brink of a sale.  The Garcias prefer to sell the property themselves, believing they can do better at a private sale than the Bank can at a sheriff's sale.  To buy time for a sale, they filed three bankruptcy cases between 2019 and 2022.

In this, the third bankruptcy case, the Bank has moved to lift the automatic stay so it can resume its foreclosure action in the state court.  The Garcias have countered with a motion to compel the court-appointed receiver to turn over the property.  The receiver has asked to be excused from his turnover obligations.

For the reasons below, the Bank's motion will be granted and the stay lifted.  With the stay lifted, it would be pointless to make the receiver return the property to the Garcias.  His motion will also be granted.  The Garcias' motion to compel turnover will be denied.

**1.  Jurisdiction**

The court has subject matter jurisdiction under 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a).  This is a core proceeding.  28 U.S.C. §§

157(b)(2)(E), (G); *see In re D/C Distribution, LLC,* 617 B.R. 600, 605 (Bankr. N.D. Ill. 2020)

(stay modification); *In re Montemurro*, 581 B.R. 565, 568 (Bankr. N.D. Ill. 2018) (turnover).

## 2. Background

The facts come from the parties' papers, the dockets and papers filed in the bankruptcy

cases (*In re Garcia*, No. 19 B 14047 (Bankr. N.D. Ill.), *In re Garcia*, No. 8:20-bk-06885-CED

(Bankr. M.D. Fla.), *In re Garcia*, No. 22 B 130 (Bankr. N.D. Ill.)); the docket in the foreclosure

action (*Albany Bank & Trust Co. v. Lincoln Auto. Grp., et al.*, No. 18 CH 4114 (Cir. Ct. Cook

Ct.)); and the docket and papers filed in a related district court action (*Biggers Holdings LLC v.*

*Julio Garcia Trust*, No. 21 C 4680 (N.D. Ill.)).[1/] No facts are in dispute.

### a. The Property, the Mortgage, and the Foreclosure Action

The Garcias are beneficiaries of a land trust that holds title to property on Lincoln

Avenue in Chicago.  The property consists of six contiguous parcels on which the Garcias and

their son run an automotive repair business called Lincoln Automotive Group.  In 2004, Albany

Bank & Trust made a $1.125 million loan to Albany Bank as trustee of the Garcias' land trust.

The Garcias personally guaranteed the loan.  The loan had a 2004 maturity date, a date later

extended to 2019, and was secured by a mortgage on the Lincoln Avenue property.

In February 2018, the Garcias defaulted on their payments.  The next month the Bank

sued in Illinois state court to foreclose on the mortgage.  According to the Bank's complaint, the

unpaid loan balance (which included unpaid property taxes) came to $783,300.46.  In April

2019, the Bank moved to have a receiver appointed.

---

[1/]     The court can take judicial notice of its own docket and the dockets of other
courts in related matters. *In re Prate*, 634 B.R. 72, 75 n.1 (Bankr. N.D. Ill. 2021).

### b.  The First Bankruptcy Case

Roughly two weeks before the Bank was to present the receiver motion, the Garcias filed a chapter 13 bankruptcy case in this district, staying the foreclosure action.  The Garcias' schedules listed a single secured creditor, the Bank.  They also listed five general unsecured creditors owed $26,731 in all.  The Garcias disclosed monthly gross income of $15,375, two-thirds of it rental income from the Lincoln Avenue property, and monthly net income of $5,281.

The chapter 13 case lasted eleven months.  During that time, the Garcias proposed three plans, none of them confirmed.  The first proposed to sell part of the Lincoln Avenue property, reducing the Bank's claim; the Garcias would then pay the reduced claim over time.  When the Bank objected to confirmation, the Garcias proposed a second plan under which they would surrender part of the property to the Bank and pay the reduced claim over time.  When the Bank objected to the second plan, the Garcias proposed a third.  Under the third plan, they would make periodic payments to the Bank and then make a $720,000 balloon payment either by selling the entire property or obtaining new financing within four years.  Again the Bank objected.  This time, the Garcias stood their ground and briefed the objection.

In April 2020, the court sustained the Bank's objection and denied confirmation.  Confirmation was denied for two reasons.  First, the plan's proposal to pay the Bank over time with a $720,000 balloon down the road violated the Bankruptcy Code's equal-monthly-payment requirement.  *See* 11 U.S.C. § 1325(a)(5)(B)(iii)(I).  Second, assuming a $720,000 balloon payment could meet that requirement, the plan was not feasible.  *See* 11 U.S.C. § 1325(a)(6).  The Garcias's sale proposal gave no listing price, described no marketing plan, and offered the Bank no remedy if a sale did not occur.  The Garcias' refinancing alternative had no details at all.

With confirmation denied, the court turned to the chapter 13 trustee's pending motion to

dismiss.  Because the Garcias had spent nearly a year proposing three plans each of which was aimed mainly at the Bank and none of which could be confirmed, it was fair to conclude that the Garcias were guilty of "unreasonable delay . . . prejudicial to creditors."  11 U.S.C. § 1307(c)(1). "The Bank can't be put off forever," the court said.  "[A]t some point, it has a right to pursue its state court remedies.  We've reached that point."  The court granted the motion and dismissed the case.

### c.  The Second Bankruptcy Case

The dismissal of the bankruptcy case allowed the Bank to resume its foreclosure action, and the Bank rescheduled its motion to appoint a receiver.  The Bank was unable to present the motion, though, because the Covid-19 pandemic forced the state court to close from April until July 2020.  On September 9, 2020, the Bank was at last able to present its motion, and the state court granted it, appointing Richard Wanland, Jr. as receiver.

Five days later, the Garcias filed a chapter 11 bankruptcy case in the Middle District of Florida.  In their schedules, the Garcias again listed a single secured creditor, the Bank.  This time they listed ten general unsecured creditors owed $54,009.  The Garcias disclosed gross monthly income of $13,623, nearly all of it rentals related to the Lincoln Avenue property, and monthly net income of $10,578.  The Garcias also filed a "Chapter 11 Case Management Summary" (required under the Florida court's local rules) announcing this strategic objective:  a plan that "restructures the Debtors' secured debt and allows a long[ ]term solution for the Debtors to deal with the claim of Albany Bank and Trust."

Because the Illinois chapter 13 case had been dismissed within a year, the Garcias moved under section 362(c)(3)(B) to extend the automatic stay beyond the statutory thirty days.  The Bank opposed the Garcias' motion and moved under section 1112(b) to dismiss the case as

-4-

having been filed in bad faith.

In October 2020, the Florida bankruptcy court declined to extend the stay and granted the Bank's motion, dismissing the case. The Garcias argued that a chapter 11 case would allow them to do what they could not do in chapter 13: pay the Bank over time and then either sell the Lincoln Avenue property with a balloon payment or refinance the debt "five years down the road." The Garcias theorized that they could pay the Bank $6,500 monthly for 60 months with a $390,000 balloon. But the Bank pointed out that the $6,500 monthly payment did not include the $2,500 due each month for taxes, and the court said it appeared the Garcias lacked the income to make the payments they were proposing. The court found that the Garcias could not confirm a plan over the Bank's objection, concluded the Garcias had filed the chapter 11 case in bad faith, and barred them from filing another bankruptcy case for one year.

### d. The Third Bankruptcy Case

The dismissal of the Florida bankruptcy case allowed the Bank to resume its foreclosure action once more. In March 2021, the Bank moved for a judgment of foreclosure and sale. Three months later, in June 2021, the state court granted the Bank's motion and entered judgment for the Bank, finding the Garcias owed the Bank $1,137,134. Between April 2018 and March 2020, the Garcias had made only $6,000 in payments toward the mortgage debt. The payments stopped altogether in March. During the same period, the Garcias also paid no taxes on the property. The Bank paid the taxes, $115,719.

While the Bank's motion for judgment was pending, Julio Garcia had signed a contract to sell the Lincoln Avenue property to Biggers Holdings LLC, an Indiana concern with subsidiaries that buy and run automotive repair shops. The contract price was $1.55 million. Biggers paid Garcia $300,000 as earnest money. But Biggers became concerned that Garcia had

misrepresented the property's environmental condition, and in July the parties agreed to terminate the contract. Despite the termination, Garcia refused to sign a release of the earnest money from escrow, and Biggers sued Garcia and others in the district court alleging breach of contract and fraud. The Biggers action is pending.[2]

In early October 2021, the state court ended the moratorium on judicial foreclosure sales that had been declared during the pandemic. The next month, the Bank had Intercounty Judicial Sales Corporation issue a notice setting January 12, 2022 as the date for the foreclosure sale of the Lincoln Avenue property.

On January 6, six days before the scheduled sale, the Garcias filed a chapter 11 case in this district. As they had in the previous cases, the Garcias scheduled a single secured creditor, the Bank. This time, they listed thirty-four general unsecured creditors owed $88,867. The Garcias disclosed gross monthly income of $7,475 (most of it wages from an employer they did not name) and net monthly income of $4,023.

Twelve days after filing their petition, the Garcias sought and received leave to employ a broker to sell the Lincoln Avenue property. In their initial status report under section 1188, the Garcias detailed the broker's efforts and their prospects for selling the property. They expressed no intention of confirming a plan of reorganization. No plan is mentioned.

The Bank now moves under section 362(d)(4)(B) of the Code to lift the stay so it can proceed with the foreclosure sale. The Garcias oppose the motion. Wanland, the receiver, moves under section 543(d)(1) to be excused from his obligations under section 543(a) to turn the property over to the Garcias. The Garcias oppose that motion as well and move to compel

---

[2]     Julio Garcia also sued Biggers in Illinois state court seeking specific performance of the contract. Biggers removed the action to the district court, but before the two actions could be consolidated Garcia voluntarily dismissed the specific performance action. *See Julio Garcia Trust v. Biggers Holdings, LLC*, No. 21 C 4912 (N.D. Ill.) (Dkt. No. 17).

Wanland to turn over the property.

### 3. Discussion

The Bank's motion will be granted.  The undisputed facts make clear that this case is part of a scheme on the Garcias' part to delay the Bank's foreclosure efforts, a scheme involving multiple cases affecting the Lincoln Avenue property.  The receiver's motion will also be granted.  With the stay lifted, compelling the receiver to return the property to the Garcias would be senseless.  The Garcias' motion will be denied.

### a.  The Bank's Motion to Lift Stay

The Bank has a right to have the stay lifted so it can resume its foreclosure action and sell the Lincoln Avenue property.  The Garcias' latest bankruptcy is the third in a series designed, not to reorganize their finances, but to put off the Bank and avoid a sheriff's sale so they can sell the property themselves.  This is a textbook case for relief under section 362(d)(4).

The filing of a bankruptcy petition automatically stays a variety of creditor actions against the debtor, the debtor's property, and property of the estate.  11 U.S.C. § 362(a); *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 755-56 (9th Cir. 1991).  The stay is "one of the fundamental debtor protections provided by the bankruptcy laws," *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 B.R. 494, 502 (1986), because it preserves the estate and gives the debtor some respite from creditors, *Reedsburg Util. Comm'n v. Grede Foundries, Inc. (In re Grede Foundries, Inc.)*, 651 F.3d 786, 790 (7th Cir. 2011); *Dean*, 72 F.3d at 755-56.  Ordinarily, the stay remains in effect until the case is closed or dismissed or the debtor is discharged.  11 U.S.C. § 362(c)(2).

Even before the stay expires under the Code, though, it may be terminated, annulled, modified, or conditioned.  11 U.S.C. § 362(d).  Because some debtors had "resorted to filing

tactical, serial bankruptcy cases to prevent creditors from enforcing liens against their property," Congress added section 362(d)(4) to the Code in 2005 as "special relief for creditors." *In re Alakozai*, 499 B.R. 698, 702 (B.A.P. 9th Cir. 2013).  Under the current version, relief from the stay of "an act against real property" must be granted at the request of "a creditor whose claim is secured by an interest in such real property" if the court finds the petition was "part of a scheme to delay, hinder, or defraud creditors that involved . . . multiple bankruptcy filings affecting such real property."  11 U.S.C. § 362(d)(4)(B).[3]  If the successful creditor records the order granting relief under applicable state law, it will be binding "in any other case under this title" for the next two years.  *Id.*  The stay will not come into effect.  11 U.S.C. § 362(b)(20).

To obtain relief under section 362(d)(4)(B), the moving creditor must show (1) that the debtor engaged in a scheme to delay, hinder, or defraud creditors, and (2) that the scheme involved multiple bankruptcy filings.  *Palladino v. HSBC Bank USA, N.A.* 502 F. Supp. 3d 1336, 1341 (N.D. Ill. 2020); *Briggs*, 2012 WL 3780542, at *4.[4]  The Code does not define "scheme," but courts have defined the term as "an intentional artful plot or plan."  *Palladino*, 502 F. Supp. 3d at 1341 (internal quotation omitted); *see also Spencer*, 531 B.R. at 217; *Wilke*, 429 B.R. at 922.

---

[3]      As originally enacted, section 362(d)(4) required a scheme to delay, hinder, *and* defraud creditors.  *See In re Wilke*, 429 B.R. 916, 922 (Bankr. N.D. Ill. 2010).  Congress amended the statute in 2010 to make the phrase disjunctive.  *In re Briggs*, No. 12 B 14843, 2012 WL 3780542, at *5 (Bankr. N.D. Ill. Aug. 31, 2012).  Since the amendment, a scheme to delay or hinder creditors is enough to warrant relief; fraud is no longer necessary.  *In re Kearns*, 616 B.R. 458, 467 (Bankr. W.D.N.Y. 2020).

[4]      The case law often slices the statutory language into three elements, separating "scheme" from the purpose "to delay, hinder, or defraud creditors."  *See, e.g., In re Lee*, 467 B.R. 906, 920 (B.A.P. 6th Cir. 2012); *Alakozai*, 499 B.R. at 703; *In re Spencer*, 531 B.R. 208, 217 (Bankr. W.D. Wis. 2015), *aff'd sub nom. Spencer v. Federal Home Loan Mortg. Corp.*, 264 F. Supp. 3d 1241 (W.D. Wis. 2017).  The two-element formulation is more helpful:  finding a scheme generally entails finding the scheme's purpose.

Because a debtor will rarely admit to a scheme, determining whether the debtor is engaged in one entails "'extrapolation'" from the facts. *In re House*, No, 17-30434-BEH, 2018 WL 1505572, at *5 (Bankr. E.D. Wis. Mar. 26, 2018) (quoting *Briggs*, 2012 WL 3780542, at *5). Relevant factors include (1) the timing of the debtor's bankruptcy cases relative to each other, to proceedings in the foreclosure action, and to scheduled foreclosure sales; (2) the debtor's lack of changed circumstances between cases; (3) dismissal of the debtor's previous cases without confirmation or discharge; (4) the debtor's inability to fund a plan; and (5) the debtor's failure to make mortgage payments for a long time. *See In re Lovato*, No. 21-10144-j13, 2021 WL 3410462, at *6 (Bankr. D.N.M. Aug. 4, 2021); *House*, 2018 WL 1505572, at *5; *In re Hymes*, No. A12-00599-GS, 2013 WL 653060, at *5 (Bankr. D. Alaska Feb. 20, 2013); *Briggs*, 2012 WL 3780542, at *5.[5]

A creditor moving for relief under section 362(d)(4)(B) bears the burden of proving the statutory requirements have been met. *Lee*, 467 B.R. at 920; *Lovato*, 2021 WL 3410462, at *5. The creditor's burden, though, is the "initial burden of going forward." *Lovato*, 2021 WL 3410462, at *5. Once the creditor meets that burden and makes out a prima facie case, the ultimate burden of proof rests with the party opposing stay relief. *Id.*

The Bank has easily met its burden here. Because the Garcias filed three bankruptcy cases, the only question is whether they filed them as part of a "scheme" to "delay" or "hinder" the Bank. They did.

---

[5]    Some decisions say that the necessary intent can be inferred "'from the fact of serial filings alone.'" *See, e.g., In re Lindsay*, No. 20-10339-JLG, 2021 WL 278317, at *7 (Bankr. S.D.N.Y. Jan. 27, 2021) (quoting *In re Procel*, 467 B.R. 297, 308 (S.D.N.Y. 2012)). Other decisions, however, rightly point out that "[m]ultiple bankruptcy filings alone, even if they have the effect of delaying a creditor's foreclosure efforts, will not satisfy [the 'scheme' requirement]." *Lovato*, 2021 WL 3410462, at *6. That is so because all bankruptcy cases delay creditors, and many are filed on the eve of foreclosure to stop collection efforts. *Id.*

Central to each of the Garcia's cases was the property and the Bank's claim.  In each case, the Bank was the only secured creditor, and in each the Garcias sought to sell the Lincoln Avenue property or refinance the Bank's debt.  In the first case, the Garcias proposed three chapter 13 plans.  Central to each plan was a sale of the property or a refinancing of the Bank's debt.  In the second case, the Garcias again announced their intention to restructure the Bank's debt and find a "long-term solution" to its claim, either a sale or a refinancing.  Between the second and third cases, Julio Garcia tried unsuccessfully to sell the property to Biggers.  In the current case, filed after the Biggers deal fell through, the Garcias have announced their intention to sell the property and have employed a broker.

The Garcias timed each of the three bankruptcy cases to delay the Bank's foreclosure action.  They filed the first case just two weeks before the Bank was scheduled to present its motion in the state court to appoint a receiver.  When the first case ended, the Bank rescheduled the motion's presentment, and the state court granted it.  Five days later, the Garcias filed the second case.  When the second case ended with a one-year bar to refiling, the Bank had time to move for judgment in the foreclosure action and schedule a sale.  But the year expired, and the Garcias filed the third case six days before the January 12 sale.  "Strategic" bankruptcy filings timed to coincide with events in a related foreclosure action strongly suggest a scheme to hinder or delay the secured creditor.  *Hymes*, 2013 WL 653060, at *5; *see, e.g., Lee*, 467 B.R. at 920-21;  *Lindsay*, 2021 WL 278317, at *7; *House*, 2018 WL 15055572, at *8.

The first two cases the Garcias were not only strategically timed but were also unsuccessful, ending without confirmed plans.  The first case lasted nearly a year.  During that year, the Garcias proposed three plans, none confirmable.  The case was eventually dismissed under section 1307(c)(1) for "unreasonable delay . . . prejudicial to creditors."  The second case did not last long enough for the Garcias to have the stay extended, let alone have a plan

-10-

confirmed.  The Bank moved immediately to dismiss the case, and the court granted the motion, finding the case had been filed in bad faith and disposing of it after only a month.

Although the Garcias have now filed another chapter 11 case, they cannot fund (and so cannot confirm) a plan.  In the current case, they disclose monthly net income of just $4,023, not remotely enough to make the $6,500 monthly payment they proposed in the Florida case (let alone the $9,000 the Bank said was due).  In fact, the Garcias' financial situation has deteriorated markedly since they filed their first case.  According to the schedules, their gross monthly income declined more than 50% (from $15,375 to $7,475) between the first case and this one, and their net income declined 24%, (from $5,281 to $4,023).  During the same period, on the other hand, their general unsecured creditors increased from six to eighty-eight, and their general unsecured debt has jumped from $15,375 to $88,867, a nearly six-fold change.  The Garcias have not even tried to explain how they can confirm a plan here, probably because they have no intention of confirming one.[6/]

Finally, the Garcias have not paid the Bank in "a long time."  *Lovato*, 2021 WL 3410462, at *6.  They defaulted on their payments to the Bank in 2018.  Between early 2018 and 2020, they paid the Bank only $6,000 toward their mortgage debt, and they have made no payments in the past two years.  Nor have they paid any property taxes.  The Bank has paid them.

For their part, the Garcias offer no real opposition to the Bank's request to have the stay lifted.  They never deny having filed multiple cases, and they offer no reason to believe those cases were anything but a scheme to hinder or delay the Bank.  Rather than confront the Bank's

---

[6/]     The Garcias might argue (although they have not argued) that their deteriorating finances are a "change in circumstances" that supports keeping the stay in place.  That would be true – if this were a chapter 7 liquidation case.  But the Garcias chose to file under chapter 11 and try to keep the property.  Because they did, their worsening circumstances simply underscore their inability to reorganize.

motion under section 362(d)(4)(B), the Garcias incorrectly treat the motion as one to dismiss the case under section 1112(b) because it was filed in bad faith. What is more, the Garcias' reasons for claiming good faith merely confirm that the stay should be lifted. The Garcias insist that the Lincoln Avenue property has enough equity to support a sale that would pay the Bank's debt and leave something for other creditors as well. (Resp. at 2-3). In other words, this case, too, was filed to hold off the Bank and allow the Garcias to sell the property themselves.

In dismissing the Garcias' first case, the court commented that the Bank "can't be put off forever" and at some point had "a right to pursue its state court remedies." That was nearly two years ago. Since then, the Garcias have filed two more cases, both designed to stave off foreclosure. But if the Bank was entitled to pursue its state court remedies in 2020, it is doubly entitled to now. The Bank's motion for relief from the stay under section 362(d)(4)(B) will be granted.[7]

### b. The Receiver's Motion to Excuse Turnover and the Garcias' Motion to Compel Turnover

The receiver's motion will likewise be granted. Because the Bank can now resume foreclosure proceedings, and because a mortgagee in Illinois has a presumptive right to

---

[7] The Bank argues that the stay should be lifted for another reason: the mortgage and note prohibit a sale of the Lincoln Avenue property without the Bank's permission. The prohibition is valid and enforceable under Illinois law. *See Baker v. Loves Park Sav. & Loan Ass'n*, 61 Ill. 2d 119, 125, 333 N.E.2d 1, 4 (1975). As a result, the Bank says, the Garcias' goal of selling the property themselves cannot be achieved, and the bankruptcy case is futile. The problem with the Bank's argument is that the Code would let the Garcias sell the property in a bankruptcy case despite the prohibition – if the price exceeded the value of the Bank's lien. 11 U.S.C. § 363(f)(3). But the record presents serious issues about the value of the property and so the price it might fetch, issues that would require an evidentiary hearing to resolve. (The Garcias, for example, have variously asserted in their bankruptcy cases that the property is worth $720,000, $500,000, and $1.6 million.) Because the Bank has a right to relief from the stay under section 362(d)(4)(B) based on facts the Garcias do not and could not contest, a prolonged hearing to determine whether the stay should be lifted for another reason would be wasteful.

possession of non-residential property during a foreclosure, a receiver should be excused from his turnover obligations under section 543(a) once the stay has been lifted to permit foreclosure. *In re Cadwell's Corners P'Ship*, 174 B.R. 744, 763 (Bankr. N.D. Ill. 1994) (granting receiver's section 543(d) motion because stay had been lifted and the secured creditor allowed to foreclose). Displacing the receiver and requiring turnover despite the stay-lift would be senseless, a "meaningless gesture." *In re Ying Hua Tam*, No. DK 12-06379, 2012 WL 3555416, at *5 (Bankr. W.D. Mich. Aug. 9, 2012) (granting section 543(d) motion). The Garcias' motion to compel turnover will be denied.

## 4. Conclusion

For these reasons, the motion of Albany Bank & Trust Co. to lift the stay under 11 U.S.C. § 362(d)(4)(B) is granted. The motion of receiver Richard Wanland to excuse compliance with 11 U.S.C. § 543(d) is also granted. The motion of debtors Julio A. Garcia and Bonnie L. Garcia to compel turnover under 11 U.S.C. § 543(a) is denied. Separate orders will be entered consistent with this opinion.

Dated: March 7, 2022

_____

A. Benjamin Goldgar
United States Bankruptcy Judge

-13-